UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA ROCHELLE LINEBARGER,

                 Plaintiff,           Civil Action No. 14-14501
                                           Honorable Marianne O. Battani
                                           Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                 Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [13, 14]

Plaintiff Lisa Rochelle Linebarger ("Linebarger") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [13, 14], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## I.     RECOMMENDATION

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Linebarger is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [14] be DENIED, Linebarger's Motion for Summary Judgment [13] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Report and Recommendation.

## II.     REPORT

### A.     Procedural History

On May 5, 2008, Linebarger filed applications for DIB and SSI.  (Tr. 113-22).   Her applications were denied initially on August 22, 2008.  (Tr. 58-65).   After an administrative hearing held on January 8, 2010 (Tr. 31-55), ALJ Michael McGuire issued a written decision, dated February 19, 2010, finding that Linebarger is not disabled under the Act.  (Tr. 17-23).   On May 25, 2011, the Appeals Council denied review.  (Tr. 1-5).   Linebarger then filed suit in the United States District Court for the Eastern District of Michigan, seeking judicial review of this final decision.   On July 18, 2012, Magistrate Judge Mark A. Randon issued a Report and Recommendation ("R&R") on the parties' cross-motions for summary judgment, recommending that Linebarger's motion be granted in part and the matter be remanded to the ALJ for further proceedings.  (Tr. 366-88).   Specifically, Magistrate Judge Randon concluded that ALJ McGuire erred in failing to provide adequate reasoning for discrediting the August 2009 and January 2010 opinions of Linebarger's treating psychiatrist, Dr. Gotlib.  (Tr. 382-86).   On September 11, 2012, District Judge Marianne O. Battani issued an Opinion and Order overruling the Commissioner's objections, adopting Magistrate Judge Randon's R&R, and remanding the case pursuant to 42 U.S.C. §405(g).  (Tr. 359-65).   On May 13, 2012, the Appeals Council issued an Order remanding the case to the ALJ for further administrative proceedings, including the opportunity for a hearing and the taking of additional evidence.  (Tr. 390-92).

After remand, a second administrative hearing was held on October 30, 2013, before ALJ Oksana Xenos.  (Tr. 336-56).   On November 18, 2013, ALJ Xenos denied Linebarger's applications for DIB and SSI, finding that she is not disabled under the Act.  (Tr. 320-31).   On October 10, 2014, the Appeals Council denied review.  (Tr. 311-13).   Linebarger timely filed for

judicial review of the final decision on November 25, 2014. (Doc. #1).

### B. Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability." *See*

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing

20 C.F.R. §404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir.

2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis

reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the

[defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**C.    Background**

*1.    Linebarger's Reports and Testimony*

In a disability report, Linebarger, who was born in 1965, indicated that she is 5'3" tall and weighs 145 pounds.  (Tr. 138, 141).  She alleges she is disabled as a result of "mental problems" and paranoia.  (Tr. 142).  At the time of the October 2013 administrative hearing, she lived with her twelve-year-old son.  (Tr. 340).  She completed the eleventh grade and eventually obtained her GED.  (Tr. 39, 146, 340).  Previously, Linebarger worked as a cook, cashier, and laborer.  (Tr. 143).  She stopped working on March 11, 2008, when her temporary job ended, and alleges that she became unable to work on April 14, 2008.  (Tr. 142).  She worked briefly as a home health care aide in 2012, caring for a friend who lived next door, until that friend died of cancer.  (Tr. 350-51).

Linebarger testified that she cannot work because she is depressed, forgets a lot of things, and "can't be around people."  (Tr. 343).  She does not like to go outside; all she does is "sit at home, watch TV, hear voices."  (Tr. 41).  For example, sometimes the voices tell her that her oldest son is going to kill her; other times, she hears her deceased aunt "telling [her] to come with her."  (Tr. 41, 348).  She takes Prozac and Invega, which help somewhat (making the voices quieter).  (Tr. 42).  Linebarger testified that she is afraid to leave the house – and even has a neighbor walk her son to school – because the voices are "telling [her] people [are] going to hurt [her]."  (Tr. 44-45).  She also sees things that are not there; sometimes she creeps around her house, looking to see if someone is there.  (Tr. 348).  She attempted to work at a temporary job, but they "got rid of [her] because [she] was nervous and freaking out."  (Tr. 343).  She admitted to prior drug and alcohol abuse but claimed she had been clean for some time.  (Tr. 50).

4

Linebarger cares for her son and cat.  (Tr. 150).  She spends most of her days watching television.  (Tr. 153, 345).  She has no difficulties with personal care, but she needs reminders to comb her hair and take medication.  (Tr. 150-51).  She is able to prepare meals on a daily basis and perform household tasks such as cleaning, ironing, and laundry, but her neighbor does her shopping for her.  (Tr. 151-52, 344).  She has difficulty sleeping, waking in the middle of the night "grabbing at the air."  (Tr. 150, 347).  She indicated that she does not leave her house alone because she is "afraid of people outside."  (Tr. 151-52).  She does not finish what she starts, has difficulty getting along with others, and does not handle stress or changes in routine well.  (Tr. 154-55).[1]

### 2.    *Medical Evidence*

Beginning in May 2008, Linebarger received consistent psychiatric treatment at Insight Recovery Center.  (Tr. 214-28, 293-303).  In May 2008, initial intake assessments were performed by therapist Lorraine Applebaum and physician Michael Gotlib.  (Tr. 214-24).  Linebarger acknowledged experiencing depression, anxiety, and having suicidal thoughts.  (Tr. 216, 218).  She also complained of hearing voices.  (Tr. 221).  During Linebarger's initial mental status examination, Ms. Applebaum noted that she suffered from phobias, suspicious thoughts, and hallucinations.  (Tr. 220).  Ms. Applebaum also indicated that Linebarger suffered from severe depression and an unrealistically low self-concept.  (*Id.*).  Linebarger was diagnosed with

---

[1] In a third party function report dated June 9, 2008, Linebarger's friend, Sylleste Lurry, generally corroborated Linebarger's statements.  (Tr. 157-64).  Specifically, Ms. Lurry indicated that Linebarger "constantly look[s] up under her bed, check[s] her doors over & over to make sure that the[y're] locked, thinking someone is breaking in," and has "small conversations to herself, thinking she's talking to someone that's not there."  (Tr. 157).  Ms. Lurry also indicated that Linebarger broke her foot in 2007, jumping from a three story building because she believed someone was trying to harm her.  (Tr. 162).

schizoaffective disorder and given a Global Assessment of Functioning[2] ("GAF") score of 45. (Tr. 221). Dr. Gotlib diagnosed Linebarger with major depression with psychotic features. (Tr. 224). He did not assign a GAF score, but he recommended Linebarger for biweekly therapy sessions and prescribed Prozac. (*Id.*). Additional mental status examinations performed by Dr. Gotlib throughout 2008 and 2009 revealed mostly normal findings (in appearance, expression, behavior, judgment, self-esteem, thought content, speech and language, memory, gait, and gross motor function), but with a consistently depressed affect. (Tr. 293-98).

In August 2008, Dr. Gotlib completed a form entitled "Medical Assessment of Ability to Do Work-Related Activities (Mental)." (Tr. 289-90). On that form, Dr. Gotlib noted that Linebarger has a "good" ability to follow work rules; "fair" ability to use judgment, function independently, and maintain attention and concentration; and "poor" or "no" ability to relate to co-workers, deal with the public, interact with supervisors, or deal with work stresses. (Tr. 289). He also indicated that she has only a "fair" ability to understand, remember, and carry out instructions (regardless of complexity), maintain personal appearance, and demonstrate reliability; and she has "poor" or "no" ability to behave in an emotionally stable manner or relate

---

[2] The GAF score is a "subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious symptoms … OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009) (quoting *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 924 n. 1 (E.D. Mich. 2005)). "A GAF score may help an ALJ assess mental [residual functional capacity], but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n. 7 (6th Cir. 2006).

predictably in social situations.  (Tr. 290).  Dr. Gotlib specifically indicated that Linebarger is "unable to relate to people" and "unable to socially interact."  (Tr. 289-90).

On August 5, 2008, Linebarger underwent a consultative examination with licensed psychologist Nick Boneff, Ph.D.  (Tr. 230-33).  Linebarger indicated that, beginning with her cousin's death in January 2008, she felt unable to work because she could not be around people. (Tr. 230).  Dr. Boneff observed that Linebarger was in "questionable contact with reality with no evidence of an overt thought disorder."  (Tr. 231).  He further noted that her thoughts were somewhat slowed at times and that she spoke slowly.  (*Id.*).  With respect to Linebarger's thought content, Dr. Boneff noted:

> The patient said that she used to hear voices, her dead cousin, grandmother and other dead people.  She said that the voices are going away possibly from the medications.  Sometimes she feels that she sees somebody reaching for stuff.  She said that every time she goes outside she feels that others are plotting against her but she does not go out much ….

(Tr. 232).  Linebarger was diagnosed with schizoaffective disorder, assigned a GAF score of 47, given a guarded prognosis, and was adjudged incapable of managing her own benefit funds.  (Tr. 233).

On August 20, 2008, James Tripp, the state agency medical consultant, reviewed Linebarger's records and opined that she retained the residual functional capacity ("RFC") to perform simple, sustained, unskilled tasks with persistence.  (Tr. 236-38).

On January 25, 2010, Dr. Gotlib and Ms. Applebaum issued a letter detailing their belief that Linebarger is not fit for work in any environment.  (Tr. 310).  Specifically, they indicated that Linebarger suffers from schizoaffective disorder and major depressive disorder, as evidenced by her delusions, hallucinations, and depressed mood "most of the day."  (*Id.*).  In addition, Dr. Gotlib and Ms. Applebaum noted that Linebarger hears voices, has disorganized speech, suffers feelings of persecution, is fearful of people, is unable to interact with others

7

appropriately, and is unable to maintain attention and concentration. (*Id.*).

Linebarger continued to treat at Insight throughout 2009 and 2010. (Tr. 484-503). During this time, she consistently presented with a depressed mood (Tr. 484, 485, 487, 489, 491, 494), flat affect (Tr. 486, 487, 495), and reported feeling isolated (Tr. 493). In an undated note, Ms. Applebaum noted that Linebarger was experiencing increased anger and depression, was isolating more than usual, and was "thinking of drinking to self medicate." (Tr. 500). Linebarger was discharged from Insight on January 13, 2011. (Tr. 464). At that time, her GAF was 50, and the discharge summary indicates that although she had "started to make good progress," insurance had terminated her treatment. (*Id.*).

On November 16, 2012, Linebarger presented for an initial psychosocial assessment at New Center Community Mental Health Services. (Tr. 540-41). She presented with blunted affect and mood, but her insight, memory, and judgment were intact. (Tr. 544). She was diagnosed with schizophrenia and assigned a GAF score of 40. (*Id.*). At her initial psychiatric examination with Swarn Mahajan, M.D. on December 14, 2012, Linebarger reported a history of hearing voices for many years, saying "she believes that the TV is talking to her and she answers it back." (Tr. 554). She reported remaining isolated, experiencing paranoid thoughts, having difficulty sleeping, and – at times – becoming agitated and aggressive. (*Id.*). On mental status examination, Linebarger had an anxious affect, normal speech, and intact memory. (Tr. 555). Dr. Mahajan diagnosed her with schizoaffective disorder and assigned a GAF score of 60. (*Id.*).

On March 22, 2013, Linebarger presented for a medication review appointment (having missed previous appointments), indicating that she had been out of medication for approximately two months. (Tr. 550). She reported feeling depressed, suffering from low energy and low motivation, and said she was both afraid to leave her home and afraid to be alone. (*Id.*). At a

8

follow-up visit in July 2013, it was again noted that Linebarger had been out of medication for three months.  (*Id.*).  Again, she reported feeling depressed, having difficulty sleeping, "hearing things" in her mind, and talking to herself.  (*Id.*).

### 3.    Vocational Expert's Testimony

Don Harrison testified as an independent vocational expert ("VE") at the October 2013 administrative hearing.  (Tr. 352-55).  The VE characterized Linebarger's past relevant work as a home health care aide as semi-skilled in nature, and light in exertion.  (Tr. 353).  The ALJ asked the VE to imagine a claimant of Linebarger's age, education, and work experience, who could perform work at all exertional levels with the following non-exertional limitations:  simple, repetitive, self-paced work (without production quotas); only minimal changes in the work setting; no contact with the general public; only occasional contact with coworkers and supervisors; and no work as a member of a team.  (Tr. 353).  The VE testified that the hypothetical individual would not be capable of performing Linebarger's past relevant work. (*Id.*).  However, the VE testified that the hypothetical individual would be capable of performing the jobs of small products assembler (2,000 jobs in southeast Michigan), laundry checker and sorter (2,000 jobs), and hand packer (1,800 jobs).  (Tr. 353-54).

Linebarger's attorney then questioned the VE, asking him about a hypothetical individual with restrictions that tracked the opinion of Linebarger's treating physician, Dr. Gotlib, i.e., a claimant of Linebarger's age, education, and work experience, who could perform work at all exertional levels, but with the following mental limitations:  no ability to relate to coworkers, deal with the public, interact with supervisors, deal with work stress, behave in an emotionally stable manner in the workplace, or relate predictably in social situations; and only a fair ability to use judgment, function independently, maintain attention and concentration, remember and carry

out instructions, maintain personal appearance, and demonstrate reliability.  (Tr. 355).  The VE testified that there would be no jobs in the regional economy that this hypothetical individual could perform.  (*Id.*).

**D.      The ALJ's Findings**

Following the five-step sequential analysis, ALJ Xenos found that Linebarger is not disabled under the Act.  At Step One, the ALJ found that she has not engaged in substantial gainful activity since April 14, 2008 (her alleged onset date).  (Tr. 323).  At Step Two, the ALJ found that she has the severe impairments of schizoaffective disorder and depression.  (Tr. 323-24).  At Step Three, the ALJ found that Linebarger's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 324-25).

The ALJ then assessed Linebarger's RFC, concluding that she is capable of performing work at all exertional levels with the following non-exertional limitations:  simple, repetitive, self-paced work (without production quotas); only minimal changes in the work setting; no contact with the general public; only occasional contact with coworkers and supervisors; and no work as a member of a team.  (Tr. 325-29).

At Step Four, the ALJ determined that Linebarger is unable to perform any of her past relevant work.  (Tr. 329).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Linebarger is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 330).  As a result, the ALJ concluded that Linebarger is not disabled under the Act.  (*Id.*).

**E.      Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the

court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all

11

evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."   *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion'").

### F.    Analysis

In her decision, ALJ Xenos rejected the December 2009 and January 2010 opinions of Linebarger's treating psychiatrist (Dr. Gotlib) and therapist (Ms. Applebaum), giving these opinions "little weight" because they purportedly were "inconsistent with the record as a whole." (Tr. 328).  At the same time, ALJ Xenos gave "great weight" to the August 2008 opinion of the state agency psychological consultant Dr. Tripp, finding that it was "consistent with the record as a whole."  (*Id.*).  In weighing these opinions, ALJ Xenos relied heavily on a single GAF score above 50 to support a finding of non-disability, claiming that it was "consistent with the record as a whole," while simultaneously rejecting or ignoring some fifteen other GAF scores that were 50 or below, finding these scores "inconsistent with the record as a whole."  (Tr. 326-328). Linebarger argues that ALJ Xenos erred in failing to give good reasons for rejecting the opinions of her treating physician, asserting that the reasons she articulated for doing so are not supported by substantial evidence.  (Doc. #13 at 9-14).  The Court agrees, finding ALJ Xenos' "record as a whole" analysis significantly flawed.

As both parties acknowledge, and as the Sixth Circuit has recently reemphasized, greater

deference is generally given to the opinions of treating medical sources than to the opinions of non-treating medical sources. *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013); *see also Rogers*, 486 F.3d at 242. The opinion of a treating physician is the subject of a special rule: such an opinion must be given controlling weight if it is well-supported and not inconsistent with the record; and, even if it is not given controlling weight, it is subject to a "rebuttable presumption of deference." *Vock v. Comm'r of Soc. Sec.*, 2014 WL 4206885, at *14 (E.D. Mich. Aug. 22, 2014) (citing 20 C.F.R. §§404.1527(c) and 416.927(c)). "Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Blakley*, 581 F.3d at 406 (citing 20 C.F.R. §404.1527(d)(2)). As a rule, the ALJ must build an accurate and logical bridge between the evidence and her conclusion. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-46 (6th Cir. 2004) (finding the ALJ's failure to make sufficiently clear why he rejected the treating physician's opinion was not harmless error, even if substantial evidence not mentioned by the ALJ may have existed to support the ultimate decision to reject the treating physician's opinion). Thus, "an ALJ's decision must articulate with specificity reasons for the findings and conclusions that he or she makes." *Bailey v. Comm'r of Soc. Sec.*, 1999 WL 96920, at *4 (6th Cir. Feb. 2, 1999).

In other words, even when a treating source's opinion is not given controlling weight because it is not well-supported by medically acceptable clinical and diagnostic techniques, or is inconsistent with other substantial evidence in the record, it should not necessarily be completely rejected; rather, it must be weighed considering a number of factors, including "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole,

and the specialization of the treating source ….”  *Wilson*, 378 F.3d at 544.

In this case, it makes sense to begin the analysis by considering Magistrate Judge Randon's prior R&R, which found that ALJ McGuire erred in failing to provide good reasons for discounting Dr. Gotlib's August 2009 and January 2010 opinions.  (Tr. 382-86).  Specifically, in discussing ALJ McGuire's evaluation of the January 2010 opinion, Magistrate Judge Randon said:

> The sole reason provided by the ALJ for disregarding Dr. Gotlib's letter was that it was "not entirely consistent with the medical evidence." **However, the ALJ did not cite any inconsistencies between the conclusions in Dr. Gotlib's letter and the rest of the medical evidence. Plaintiff's diagnosis with schizo-affective disorder and major depressive disorder, Dr. Boneff's independent observation that Plaintiff seemed to be "in questionable touch with reality," and Plaintiff's own refusal to leave her home to take her son to school, all are consistent with Dr. Gotlib's findings.**  Further, these alleged inconsistencies alone are not sufficient to support a wholesale rejection of Dr. Gotlib's opinion.  In light of Dr. Gotlib's expertise as a psychiatrist, and the fact that Plaintiff had repeatedly received treatment from him for more than eighteen months, the ALJ was required to provide clear and specific reasons for discounting his opinion.  Therefore, a remand is warranted for the ALJ to further consider Dr. Gotlib's medical opinion expressed in the third paragraph of the January 2010 letter [that Linebarger is "fearful of people and unable to interact with others appropriately"], and, at a minimum, provide a more thorough explanation of why he chose to reject Dr. Gotlib's letter.

(Tr. 385-86 (internal citations omitted) (emphasis added)).

On remand, ALJ Xenos did in fact "further consider" Dr. Gotlib's August 2009 and January 2010 opinions, saying:

> [Dr. Gotlib's August 2009 Medical Source Statement] indicates that the claimant had poor or no ability to relate to coworkers, deal with the public, interact with supervisors, deal with work stresses, behave in an emotionally stable manner, or relate predictably in social situations.  The statement also indicates that the claimant was "unable to relate to people" and had "fear of people."  [The January 2010 letter] states that the claimant was "unable to function in any work environment."  The undersigned gives little weight to these opinions, as they are inconsistent with the record as a whole.  Specifically the doctor's opinions as to a

14

> purported inability to relate with others and a fear of people are wholly inconsistent with the evidence in the record, which notes that the claimant shopped in stores, used public transportation, spent time with others, and had friends. Furthermore, the findings on the numerous nearly unremarkable mental status examinations in the record contrast with these opinions.

(Tr. 328). Thus, ALJ Xenos purportedly gave "good reasons" for discounting Dr. Gotlib's opinions – namely, that they were inconsistent with Linebarger's reported activities of daily living and certain medical evidence. The problem, however, is that these alleged "good reasons" are not supported by substantial evidence.

As set forth above, ALJ Xenos first rejected Dr. Gotlib's opinion that Linebarger has an inability to relate to others and a fear of people as "wholly inconsistent with the evidence in the record, which notes that [she] shopped in stores, used public transportation, spent time with others, and had friends." (Tr. 328). In reaching this conclusion, however, ALJ Xenos appears to have extracted selective statements from Linebarger's disability reports and/or testimony, while ignoring other significant contrary evidence. For example, whereas the ALJ wrote that Linebarger "shopped in stores" and "used public transportation," implying that she regularly engaged in these activities, Linebarger's hearing testimony suggests otherwise:

> Q. How did you get here to this Hearing?
> A. Caught the bus.
>
> Q. Okay. Is that how you typically get around?
> A. I usually don't go anywhere, but I knew I had to be at this hearing, so –
>
> Q. So, but when you need to get somewhere, you take a bus.
> A. Uh-uh.
>
> Q. How do you get around?
> A. My neighbor usually takes me, or I don't go nowhere. I don't really go anywhere.
>
> Q. How often do you go grocery shopping?
> A. I don't. My neighbor do it for me.

(Tr. 344). Thus, a fair reading of Linebarger's hearing testimony[3] belies the ALJ's conclusion that Linebarger's activities of daily living are inconsistent with Dr. Gotlib's opinion that she is generally "unable to relate to people."

Similarly, ALJ Xenos' finding that Linebarger "spent time with others, and had friends" (Tr. 328) is suspect. Indeed, Linebarger testified at the administrative hearing that she "can't be around people." (Tr. 343). She does not like to go outside; all she does is "sit at home, watch TV, hear voices." (Tr. 41). Linebarger further indicated that she is afraid to leave the house – and even has a neighbor walk her son to school – because the voices are "telling [her] people [are] going to hurt [her]." (Tr. 44-45, 151-52). In a third party function report, Linebarger's friend, Sylleste Lurry, confirmed that she does not spend time with others and "shuts herself in her home." (Tr. 161, 163). Finally, this evidence appears to be consistent with her reports to her physicians and therapists (*e.g.*, Tr. 217 ("does not like to be with people"), 536 ("gets anxious around people and stays inside"), 550 ("'staying in the house, afraid to go out'")), as well as her diagnoses of schizoaffective disorder and major depressive disorder with psychotic features (Tr. 221, 224), and her prescribed treatment plan of regular therapy and anti-psychotic medications (Tr. 224).

Thus, the primary reasons articulated by ALJ Xenos for discounting Dr. Gotlib's opinions that Linebarger is unable to relate to people, deal with work stresses, behave in an emotionally

---

[3] To be fair, Linebarger did indicate, in a May 2008 function report, that she was able to shop in stores for food and clothes once a month. (Tr. 152). However, ALJ Xenos made no effort to reconcile any purported inconsistency between this older statement and Linebarger's testimony at the hearing some five years later, and the Court finds the 2013 testimony more probative of Linebarger's abilities during the relevant period of time. This is particularly true where Linebarger's hearing testimony – that she neither shops in stores nor uses public transportation on a regular basis – is supported by contemporaneous statements made to her medical providers over the years. (*E.g.,* Tr. 231 (August 2008 note that she "will send someone to the grocery store for her"; Tr. 550 (March 2013 note that she stays in the house and is afraid to go out)).

stable manner, and relate predictably in social situations simply are not supported by substantial evidence.

ALJ Xenos also discounted Dr. Gotlib's opinions about Linebarger's ability to relate to others and function in a work environment because "the findings on the numerous nearly unremarkable mental status examinations in the record contrast with these opinions." (Tr. 328). It is true that the record contains evidence of some relatively normal mental status examinations. (Tr. 496-503). However, there is a significant amount of evidence that is *consistent* with Dr. Gotlib's opinions that ALJ Xenos failed to properly discuss and weigh.[4] For example, the consultative examiner, Dr. Boneff, observed that Linebarger was in "questionable contact with reality," characterized her prognosis as guarded, and adjudged her incapable of managing her own benefit funds. (Tr. 231, 233). Such significant findings, particularly by the Agency's own examining physician, certainly appear consistent with Dr. Gotlib's opinions, yet the ALJ rejected

---

[4] The Court recognizes that an ALJ is not required to discuss all of the record evidence, and an ALJ's failure to cite specific evidence does not indicate that it was not considered. *See Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 489 (6th Cir. 2005); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009)). Indeed, under the deferential "substantial evidence" standard, an ALJ need not support his findings with a preponderance of the evidence. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc). However, a substantiality of evidence evaluation does not permit a selective reading of the record. *See Trudell ex rel. Bushong v. Apfel*, 130 F. Supp. 2d 891, 895 (E.D. Mich. 2001) ("Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.") (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir.1984)). *See also Laskowski v. Apfel*, 100 F. Supp. 2d 474, 482 (E.D. Mich. 2000) (substantial evidence "cannot be based on fragments of the record"). In other words, where an ALJ's decision discusses only the record evidence which supports his conclusion, while failing to discuss or explain away significant contrary pieces of evidence, that conclusion is not supported by "substantial evidence." *See Walker v. Comm'r of Soc. Sec.*, 2013 WL 2393178, at *13 (E.D. Mich. May 31, 2013); *see also Roberts v. Colvin*, 2015 WL 181658, at *10 (E.D. Mich. Jan. 14, 2015) ("the quality and volume of evidence not discussed by the ALJ may 'raise[] serious doubts about the supportability of the ALJ's RFC finding'" and overall conclusions") (quoting *Wilcox v. Comm'r of Soc. Sec.*, 2014 WL 4109921, at *7 (E.D. Mich. Aug.19, 2014)).

them as "inconsistent with the record as a whole." (Tr. 328).[5]

The ALJ's circular discussion of the GAF scores assigned to Linebarger over the course of her mental health treatment also exemplifies the inadequate analysis. Specifically, the ALJ referenced Linebarger's GAF scores of 45 (in May 2008), 47 (in August 2008), 50 (in January 2011), and 40 (in November 2012). (Tr. 326-28). Each of these GAF scores suggests that Linebarger has serious mental symptoms or serious impairment in social, occupational, or school functioning, and is "consistent with a finding of disability." *See Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 527 (6th Cir. 2004). However, the ALX gave "little weight" to these GAF scores, generally finding each of them to be "inconsistent with the record as a whole."[6] (Tr. 326-28). This is true despite the fact that the record contains at least *ten more GAF scores*, all of which range between 40 and 50 – again, suggesting serious symptoms and the inability to maintain a job. (Tr. 468, 470, 472, 474, 478, 505, 511, 512, 515, 519, 541). And, most perplexingly, despite the existence of some fifteen GAF scores ranging between 40 and 50, ALJ Xenos gives "great weight" to the only GAF score above 50 in the record (a GAF score of 60

---

[5] The Commissioner argues that ALJ Xenos properly rejected Dr. Boneff's assessment that Linebarger was not in touch with reality, asserting that such a conclusion is inconsistent with his examination findings, including "that there was no evidence of a thought disorder or loose, circumstantial, or tangential associations, her immediate recall was three out of three, and she knew her date of birth and age." (Doc. #14 at 19 (citing Tr. 231-32)). However, other findings by Dr. Boneff provide ample support for his conclusions – namely, that Linebarger's thoughts were somewhat slowed at times, she was able to recall only one of three objects after a delay of three minutes, she could not name any past presidents or large cities, and she could not perform serial sevens. (Tr. 231-32).

[6] Actually, although the ALJ purported to give more specific reasons for according "little weight" to each of these GAF scores, it is clear that she simply rejected each because it was inconsistent with the December 2012 GAF score of 60 discussed below. (*See, e.g.,* Tr. 327 (assigning little weight to the January 2011 GAF score of 50 in part because the December 2012 GAF score "notes only moderate mental symptomatology"); Tr. 327 (assigning little weight to the November 2012 GAF score of 40 because "less than one month later, Swarn Mahajan, M.D., assessed the claimant with a GAF score of 60"); Tr. 328 (assigning little weight to the GAF score of 47 assigned by Dr. Boneff because 'the most recent GAF assessment in the record reflects only moderate mental symptoms")).

18

assigned by Dr. Mahajan in December 2012), finding this score alone to be "consistent with the record as a whole."  (Tr. 327).

The Commissioner correctly points out in her motion that, "[T]he Sixth Circuit has concluded that '[a]ny failure to reference Global Assessment Functioning scores or to compare different scores attributed to the same subject, without more, does not require reversal.'"  (Doc. #14 (quoting *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 416 (6th Cir. 2006)).  Indeed, there is no statutory, regulatory, or other authority requiring the ALJ to "put stock" in a GAF score.  *See White v. Comm'r of Soc. Sec.*, 2011 WL 5104622, at *3 (E.D. Mich. Oct. 27, 2011) (quoting *Kornecky*, 167 F. App'x at 511).  Here, however, where the ALJ considered Linebarger's GAF scores – and, clearly did "put stock" in the single GAF score above 60 – she also had a duty to fairly consider and evaluate these GAF scores in their totality.  *See Boruff v. Astrue*, 648 F. Supp. 2d 932, 943 (E.D. Mich. 2009) (ALJ's rejection of opinion of treating physician, who assigned GAF score of 50, as "not consistent with the medical evidence," was not supported by substantial evidence where record contained evidence of four other GAF scores ranging from 50 to 56).  *See also, supra* fn. 4.

In light of the above analysis, the Court concludes that the ALJ failed to properly apply the treating physician rule.  Indeed, all of the treating and examining source opinions – including that of Dr. Boneff in August 2008, and those of Dr. Gotlib and Ms. Applebaum in August 2009 and January 2010 – seem to agree that Linebarger experiences a disabling level of mental symptoms.  They seem also to square with Linebarger's testimony, as well as the diagnoses, treatment, third-party reports, and vast majority – indeed, all but one – of the GAF scores assigned to Linebarger between 2008 and 2013.  However, ALJ Xenos gave "little weight" to all three of these medical opinions, and all of these GAF scores, finding them "inconsistent with the

record as a whole."  Instead, she credited only a single GAF score and the opinion of the state agency psychologist, James Tripp, who did not examine Linebarger (but merely reviewed her medical records in 2008, more than five years before the administrative hearing), finding only those two pieces of evidence to be "consistent with the record as a whole."[7]

For all of these reasons, the Court cannot conclude that ALJ Xenos' decision to give little weight to the opinions of Linebarger's treating physician is supported by substantial evidence and, thus, recommends remand for further consideration of these opinions and the other evidence discussed herein.[8]

III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [14] be DENIED, Linebarger's Motion for Summary Judgment [13] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Report and Recommendation.


Dated: October 9, 2015                          s/David R. Grand
Ann Arbor, Michigan                             DAVID R. GRAND
                                                United States Magistrate Judge

---

[7] The Commissioner argues that it is not error for an ALJ to give "significant weight to a non-examining physician's opinion even if the doctor has not reviewed the entire record."  (Doc. #14 at 9 (citing *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1002 (6th Cir. 2011) and *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2010)).  Although a correct statement of the law, this assertion is beside the point here, where the ALJ's decision to give significant weight to Dr. Tripp's opinion is not supported by substantial evidence.

[8] Linebarger also argues that the ALJ erred in failing to reconcile contradictory VE testimony from the first and second administrative hearings.  (Doc. #13 at 8-9).  Because the Court is recommending remand on other grounds, it need not reach the merits of this argument.

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 9, 2015.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
